UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DEBRA LONDON,

    Plaintiff,

    v.

WELLS FARGO BANK, N.A,

    Defendant.

Case No. 2:17-cv-00687-KJM-AC

<u>ORDER</u>

        Plaintiff alleges defendant is improperly attempting to foreclose on her home after she successfully concluded Chapter 13 bankruptcy proceedings. Defendant contends plaintiff violated the parties' agreement by failing to pay insurance and taxes for her property throughout a portion of the bankruptcy proceedings. Defendant now moves for summary judgment. As explained below, the motion is GRANTED in part and DENIED in part.

I.    <u>UNDISPUTED FACTS</u>

        The following material facts ("UMF") are drawn from defendant Wells Fargo Bank, N.A.'s statement of undisputed facts, ECF No. 60-1, plaintiff Debra London's responses to that statement, ECF No. 68-1 at 2−13,[1] London's statement of undisputed facts ("Pl. UMF"),[2] ECF No.

---

[1] London filed an errata replacing her initial filing, ECF No. 66, to "correct citations and [] typographical errors in the pronouns . . . ." ECF No. 68 at 2. The court relies on the corrected version here.

[2] Because London is not moving for summary judgment, her basis for identifying undisputed facts is unclear. Nonetheless, Wells Fargo responded to that statement and the court therefore

1

68-1 at 14−20, and Wells Fargo's responses, ECF No. 72-2. Unless otherwise noted, the facts the court relies on here are undisputed.

A.  London's Loan, Modification and Default

London owns and lives at 16355 Targowski Lane, Tracy, California 95304. Pl. UMF 1. On June 6, 2006, London obtained a $725,000 loan from World Savings Bank, FSB, Wells Fargo's predecessor,[3] with the loan memorialized by a note and secured by a deed of trust against London's property. UMF 1, 3. The loan agreement contains several terms, including a term under which London agreed to pay taxes and hazard insurance premiums on the property and repay Wells Fargo for advances it made for taxes and insurance through an escrow account. UMF 2; Resp. UMF 2 (London disputing insofar "Wells Fargo fails to provide the full context of the loan agreement" and identifying other relevant terms). The promissory note includes a provision that requires Wells Fargo "to deliver or mail to [London] a notice of any changes in the amount of [her] monthly payment, called 'Payment Change Notice,' before each Payment Change Date. The Payment Change Notice will include information required by law." Resp. UMF 2; Def. Ex.[4] 2 § 3(H).

On June 30, 2009, London received a loan modification, forgiving outstanding interest through July 14, 2009, with modified payments on the $668,193.07 loan balance beginning on August 15, 2009. SUF 4; Def. Ex. 4 at 1; Pl. Ex.[5] 1 at 1.[6] Under the modification, London's payment and interest rate would increase on July 15 of each year through July 15, 2015, at which point London would begin making principal and interest payments. Def. Ex. 4 at 1; Pl. Ex. 1 at 1.

---

considers it, as relevant, here.

[3] The court refers to Wells Fargo and its predecessors as "Wells Fargo" throughout this order.

[4] Wells Fargo's exhibits are provided in ECF Nos. 60-3, 60-4 and 60-6.

[5] London's exhibits are provided at ECF Nos. 66-1 to 66-3.

[6] Given that the parties' exhibits are not individually paginated, the court cites to ECF page numbers except where it is possible to cite internal paragraph numbers or line and page numbers. Because this exhibit consists of a single document with internal pagination, the court cites the internal page number.

The modification agreement provided London's payments "DO NOT include amounts necessary for escrow." UMF 4 (original emphasis).

On June 16, 2010, Wells Fargo informed London by letter that she had defaulted on the loan and indicated that Wells Fargo intended to commence foreclosure, with London's loan $6,694.62 past due. UMF 5 (disputed only as to legal conclusion loan was in default); Def. Ex. 5.

B.    London's Chapter 13 Bankruptcy Petition, Wells Fargo's Objection, and London's First Amended Plan

On January 2, 2011, London filed a Chapter 13 bankruptcy petition. UMF 6. During London's bankruptcy proceedings, Wells Fargo advanced payments to cover property taxes and property insurance. UMF 11. On January 10, 2011, Wells Fargo sent London an initial escrow account disclosure statement explaining Wells Fargo had established an escrow account, stating London owed a minimum payment of $2,241.23, an escrow payment of $1,045.48, and $26.10 in "Shortage Payment or Overage Credit" because of a $313.16 escrow shortage, with a new total monthly payment of $3,312.81 due March 15, 2011. UMF 12; Def. Ex. 6. On January 17, 2011, Wells Fargo sent a letter to London's bankruptcy attorney, Jeffrey M. Meisner, stating London's "first post-petition payment of $3130.13 is/was due on 1/15/2011." UMF 13; Def. Ex. 7. The letter also stated, "This amount may have been reduced due to the removal of an existing escrow shortage payment. Any escrow that was due at the time of the bankruptcy filing may have been added to the proof of claim." Def. Ex. 7. The letter noted, "For the duration of the bankruptcy, billing statements will not be mailed." *Id.*

On February 22, 2011, Wells Fargo objected to confirmation of London's proposed bankruptcy plan. UMF 7; Def. Req. for Jud. Notice ("RJN"), ECF No. 60-7, Ex.[7] B.[8] In its objection, Wells Fargo stated that although London's proposed plan "schedules Wells Fargo as a Class 1 creditor with pre filing [sic] arrearages of $24,136.00 . . . . Pre-filing arrearages are owed

---

[7] Wells Fargo's RJN exhibits are provided at ECF No. 60-8.

[8] The court does not judicially notice the contents of Wells Fargo's objection as an undisputed fact. Therefore, the court notices the existence of the document but otherwise DENIES the request for judicial notice.

to Wells Fargo in this matter in the amount of $33,294.60 . . . . As such, it appears that the amount scheduled by the Debtor to be paid under the supervision and control of the Chapter 13 Trustee is insufficient to fund the proposed Plan." Def. RJN Ex. B ¶¶ 3−5 (emphasis omitted).[9]

London filed a first amended Chapter 13 bankruptcy plan on March 14, 2011, in which she listed Wells Fargo as her sole class one secured creditor with a monthly contract installment of $3,130.13 for pre-petition arrearages of $33,294.60 at a 0 percent interest rate and with a monthly dividend of $574.04. UMF 8; Conf. Plan,[10] Def. RJN Ex. C; Pl. Ex. 2, Pl. RJN, ECF No. 67, Ex. B. Under London's proposed plan, she would pay the trustee $4,126.00 each month for 60 months, "subject to adjustment pursuant to section 3.10(d) below." Conf. Plan § 2.01. Under section 3.10(d), for monthly contract installments paid by the trustee on Class 1 claims,

> Upon their receipt, Debtor shall mail or deliver to Trustee all notices from Class 1 creditors including, without limitation, statements, payment coupons, impound and escrow notices, default notifications, and notices concerning changes of the interest rate on variable interest rate loans. The automatic stay is modified to permit the sending of such notices. . . . If any such notice advises Debtor that the amount of the contract installment payment has increased or decreased, the plan payment shall be adjusted accordingly.

*Id.* § 3.01(d). Wells Fargo cites London's testimony that she could not specifically recall when or how often she provided her bankruptcy attorney with documents she received from Wells Fargo regarding her loan. UMF 9 (citing London Dep., Def. Ex. 33 at 49:7–50:5, 50:22–51:24, 72:18–

---

[9] Although Wells Fargo's objection states Wells Fargo's January 26, 2011 proof of claim is attached, no such attachment has been provided to the court. RJN Ex. B ¶ 4. Wells Fargo confirmed at hearing that although it filed a proof of claim in the bankruptcy court, it did not include that claim in the record here because, in Wells Fargo's assessment, the proof of claim is immaterial to this motion. Wells Fargo also made no attempt to explain whether Wells Fargo or London was obligated to notify the bankruptcy court of the loan modification or whether either party ever did so.

[10] London filed a general objection to Wells Fargo's request for judicial notice, arguing, without elaboration, the court may not take notice of the contents of any document relied on by Wells Fargo. Obj. to RJN, ECF No. 66-5, at 2. London's objection as to this document is puzzling and not well taken, particularly because London relies on and, in fact, requests the court judicially notice the same document. London's objection is OVERRULED and the request for judicial notice is GRANTED. This ruling applies to other documents to which London raises an unspecified objection while also relying on the contents of the document.

4

74:6, 75:7–24).  London points to her testimony that she initially gave the trustee and her attorney "everything [she] had from the bank."  Resp. UMF 9 (citing London Dep. at 49:4–6).  London also testified that after she filed for bankruptcy, she did not "really remember getting much correspondence . . . ."  London Dep. at 37:25−38:1; *see also id.* at 51:21−24 ("Q: Do you recall, after your bankruptcy started, maybe receiving correspondence directly from Wells Fargo?  A.  Not that I can recall.").

C.  The Bankruptcy Court Approves London's First Amended Plan with Wells Fargo's Approval and Consent; London's Bankruptcy Payments Begin

On June 8, 2011, the bankruptcy court approved London's first amended Chapter 13 bankruptcy plan, with London to pay $4,139 per month throughout the 60-month plan.  UMF 10; Def. RJN Ex. D at 58−59; D. London Decl. Ex. 2 at 12−13.  That court's order also provided in relevant part: "For months 4 through 60, the first mortgage arrears owed to Wells Fargo Bank will be paid in the amount of $594.55 per month until the arrears of $33,294.60 are paid in full.  [¶] The Debtor's plan payment will be $4,139.00 per month for the duration of the 60 month plan." RJN Ex. D at 59.  Wells Fargo's counsel signed the order approving the plan, noting Wells Fargo "[a]pproved and consented," as did London and the trustee.  *Id.*

On June 11, 2011, Wells Fargo sent letters to Meisner and the trustee stating, under the terms of the modification agreement, the interest rate on London's loan would increase to 4.400 percent effective August 15, 2011, with London's monthly payments adjusting to $2,450.05.  UMF 14; Def. Ex. 8.  Wells Fargo noted that if it "pays the taxes and/or insurance, please refer to the monthly billing statement for the total payment amount with escrow."  UMF 14; Def. Ex. 8.  In a Wells Fargo account statement dated July 19, 2011 with a payment due date of August 15, 2011, which Wells Fargo contends it sent to London, Wells Fargo identified a $3,521.63 total payment due, including $1,071.58 in "Escrow/Other," with $5,129.37 in year-to-date escrow disbursements for taxes.  Def. Ex. 24 at 135; *see* Smith Decl., ECF No. 60-2, ¶ 33 (identifying Exhibit 24 as "copies of monthly mortgage statements sent to Plaintiff with statement dates on or about January

/////

5

2011 through November 2016"). This monthly statement includes, as do all of Wells Fargo's monthly account statements, the following "IMPORTANT MESSAGE[]":

> If you are currently in Bankruptcy this statement is for informational purposes only. It reflects Post Petition amounts under Section 2 (except for Total Outstanding Deferred Interest) and may not include all fees incurred. Please contact the Bankruptcy Department at 1-866-259-7728 if you would like to stop receiving statements, have any questions, do not accept this statement as a conforming statement, or to request Reinstatement Figures, as this statement is not intended to be used for reinstatement purposes. While the loan is in an active bankruptcy status, you may not be able to access the account online.

Def. Ex. 24 at 135. Neither party acknowledges this disclaimer or addresses its significance here.

On August 3, 2011, the trustee sent London a letter explaining he had received "correspondence . . . from your Lender indicating your ongoing mortgage payment is decreasing from $3,0130.13 to $2,450.05 effective 8/1/11. As a result of that decrease, as provided for by your Chapter 13 Plan, your plan payment is decreased from $4,139.00 to $3,384.00 starting August 25, 2011." Pl. Ex. 3; Pl. UMF 5; Resp. Pl. UMF 5 (disputing because the "$2,450.05 . . . did not cover escrow amounts advanced").

D.  London's Monthly Payments and Escrow Account

According to Wells Fargo, from September 2011 through March 2014, London "made repeated payments of $2,405.05 that were insufficient to cover the monthly payment including escrow charges advanced by Wells Fargo." UMF 15; Resp. UMF 15 (London disputing, as she "made payments in the amount of $3,384.00 [to the trustee]"). Wells Fargo acknowledges it "also received additional payments of other amounts during this time," though it does not explain how much it received or whether these amounts were paid to London's alleged escrow arrears. *See* Smith Decl. ¶ 16 n.1; *see also, e.g.*, Activity Statement, Def. Ex. 18 at 92 (indicating Wells Fargo received "Trustee Funds" in the amount of $1,189.10 on January 11, 2012 and "Debtor Funds" in the amount of $2,450.05 on January 12, 2012); Smith Decl. ¶ 27 (identifying Exhibit 18 as "a Customer Account Activity Statement that itemizes debits and credits to the account, as well as running balances of the unpaid principal, escrow, unapplied

/////

6

funds, and details about fees charged to [London's] account" prepared by Wells Fargo in response to London's April 2016 inquiry).

On June 17, 2012, Wells Fargo sent letters to Meisner and the trustee indicating that with London's August 2012 payment, the interest rate on her loan would increase to 4.775 percent, as provided under the modification agreement, with her monthly payment increasing to $2,658.86. UMF 17; Def. Ex. 9. The letter also noted, "If Wells Fargo pays the taxes and/or insurance, please refer to the monthly billing statement for the total payment amount with escrow." UMF 17. London responds that Meisner was no longer her bankruptcy counsel by this time, an assertion she repeats in response to nearly every reference to Meisner after this point, and she disputes that her then-current bankruptcy attorney, Nicholas Lazzarini, received Wells Fargo's letter. Resp. UMF 17.[11] Wells Fargo concedes it did not file a notice of payment change ("PCN") with the bankruptcy court, as required under Bankruptcy Rule 3002.1(c),[12] in August 2012. UMF 37. Wells Fargo's records indicate it continued to receive payments of $2,450.05 and $594.55 in August 2012, as it had in months prior. Activity Statement at 94.

On June 5, 2013, Wells Fargo sent a letter to Meisner, stating Wells Fargo's internal review of London's account indicated Wells Fargo had not provided London "with a timely notice in accordance with Federal Rule of Bankruptcy Procedure 3002.1(c)." UMF 18. Wells Fargo

---

[11] While London cites docket entry 66 on a printout of the bankruptcy docket to support this point, that entry states only, "Amended/Modified Plan Re: 7 Plan Filed by Debra Lynn London" and does not indicate London substituted bankruptcy counsel or that Meisner was terminated as her counsel. Resp. UMF 17; Pl. RJN, Ex. G at Entry 66. Further, according to the party identifications provided at the top of that docket, London was represented by Lazzarini, Meisner and another attorney named Kenrick Young, and there is no indication Meisner was ever terminated. Pl. RJN Ex. G at 47.

[12] Under this provision,

> The holder of the claim shall file and serve on the debtor, debtor's counsel, and the trustee a notice itemizing all fees, expenses, or charges (1) that were incurred in connection with the claim after the bankruptcy case was filed, and (2) that the holder asserts are recoverable against the debtor or against the debtor's principal residence. The notice shall be served within 180 days after the date on which the fees, expenses, or charges are incurred.

Fed. R. Bankr. P. 3002.1(c).

7

further informed Meisner it had "made the appropriate adjustment to your client's account." UMF 18. The letter does not explain which "adjustment" was made. Def. Ex. 10. London again responds that Meisner was no longer her bankruptcy attorney at this point. Resp. UMF 18.

On June 17, 2013, Wells Fargo sent letters to Meisner and the trustee stating, under the modification agreement, the interest rate on London's loan would increase to 5.150 percent, with the monthly payment due on August 15, 2013 increasing to $2,867.67. UMF 19; Def. Ex. 11. The letter again advised, "[i]f Wells Fargo pays the taxes and/or insurance, please refer to the monthly billing statement for the total payment amount with escrow." UMF 19; Def. Ex. 11. Wells Fargo concedes it did not file a PCN with the bankruptcy court, as required under Bankruptcy Rule 3002.1(c), for the August 2013 payment change. UMF 37. Wells Fargo's records indicate it received payments of $2,450.05 and $594.55 in August 2013, as it had in the months prior. Activity Statement at 96.

On December 27, 2013, Wells Fargo sent an annual escrow account disclosure statement to London's Meisner, stating:

> [E]ffective with the March 15, 2014 payment, the new monthly/bi-weekly payment amount will be $4,378.54. Our records indicate the loan is contractually due for the 07-15-12 payment. [¶] Please adjust your records to reflect the new post petition payment amount, if applicable. The debtor and the Trustee have been notified of this payment change under separate cover.

UMF 20; Def. Ex. 12.

According to Wells Fargo's records, London began making monthly payments of $4,378.54 and $594.55 in April 2014. Activity Statement at 98; *see* UMF 15 (contending "September 2011 through March 2014, Plaintiff made repeated payments of $2,450.05"); *see also* UMF 36 (Wells Fargo filed a PCN on February 14, 2014).

On August 11, 2014, Wells Fargo sent another letter to Meisner, stating, as it had earlier, "Wells Fargo Home Mortgage recently completed an internal review of your client's account referenced above. During this review, we discovered your client was not provided with a timely notice in accordance with Federal Rule of Bankruptcy Procedure 3002.1(c). As a result, we have made the appropriate adjustment to your client's account." UMF 21, Def. Ex. 13.

8

On December 18, 2014, Wells Fargo sent a letter and an annual escrow account disclosure statement to Meisner, stating:

> [E]ffective with the February 15, 2015 payment, the new monthly/bi-weekly payment amount will be $4,399.31. Our records indicate the loan is contractually due for the 11-15-13 payment.
>
> Please adjust your records to reflect the new post petition payment amount, if applicable.

UMF 22; Def. Ex. 14. Although the letter also states, "[t]he debtor and the Trustee have been notified of this payment change under separate cover," nothing in the record indicates Wells Fargo notified London or the trustee of this change. Def. Ex. 14; *see* Resp. UMF 22 (London disputing this letter was sent to Lazzarini). Nonetheless, according to Wells Fargo's records, in March 2015, London began making monthly payments of $4,399.31 and $594.44. Activity Statement at 99−100.

On November 19, 2015, the United States Bankruptcy Court for the District of Maryland filed an order approving a settlement between the United States Trustee Program and Wells Fargo. Def. Ex. 26 (letter and settlement payments to London, with copy of settlement agreement following). The settlement arose after "the Executive Office for United States Trustees . . . approached Wells Fargo . . . with concerns regarding the timeliness of filing and the failure to file PCNs required under Bankruptcy Rule 3002.1" in bankruptcy cases proceeding nationwide. Def. Ex. 26 at 145. The settlement provided that it may "not be used as an admission of liability, violation, or wrongdoing by Wells Fargo" and the Maryland bankruptcy court "retain[ed] exclusive jurisdiction over all matters subject to" the settlement. *Id.* at 161.

Wells Fargo sent London[13] an escrow account disclosure statement dated December 7, 2015, indicating London had an escrow shortage of $9,288.65 and providing her with two payment options to cure the shortage in connection with the making of her February 15, 2016 payment. UMF 23; Def. Ex. 15. Under the first option, London would pay the entire escrow

---

[13] Here, the court does not intend to imply that Wells Fargo sent this statement to London through her attorney. According to Wells Fargo and the record, Wells Fargo sent this statement directly to London. If the record shows Wells Fargo sent both London and her attorney a document, the court expressly notes as much.

9

shortage in a single payment, then a new monthly payment of $5,122.46.  Def. Ex. 15.  Under the second option, she would pay the escrow shortage over 12 months, with a new monthly payment of $5,896.41.  *Id.*; UMF 23.

E.  London Completes Payments under Bankruptcy Plan

On February 18, 2016, the trustee sent London a letter, stating: "[Y]ou have completed your Chapter 13 Plan.  You may stop making payments to the Trustee.  You need to commence making payments directly to your mortgage lender(s).  Please contact your lender(s) to obtain current payment information."  Pl. Ex. 4.  That same day, the trustee filed on the bankruptcy case docket a trustee's notice of final cure payment.  Bankruptcy Dkt. Entry 79.

Wells Fargo filed its first response to the trustee's notice of final cure payment on March 9, 2016, agreeing London had paid all pre and post-petition fees under 11 U.S.C. § 1322(b)(5).[14]  Pl. RJN Ex. F at 32−35.  Wells Fargo then filed a second response a day later, on March 10, 2016, this time disputing that London had paid all post-petition fees under 11 U.S.C. § 1322(b)(5).  Pl. RJN Ex. F at 36−45; Def. Exhibit 17 at 78.[15]

In Wells Fargo's March 10, 2016 response, under a section entitled, "Past Due Payments," Wells Fargo responded to the question, "Escrow advance on the account?" by checking the box, "No."  Def. Ex. 17 at 80.  Wells Fargo then identified the post-petition amounts it

---

[14] Under this provision, a bankruptcy plan may:

> [P]rovide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due.

11 U.S.C. § 1322(b)(5).

[15] Wells Fargo's opening papers did not acknowledge it filed two separate responses.  *See* UMF 24−25 (identifying March 10, 2016 response without acknowledging earlier response); Smith Decl. ¶ 26 (identifying Exhibit 17 as a true and correct copy of filing without acknowledging earlier filing).  In addressing the additional filing for the first time on reply, Wells Fargo claims "[t]he initial response to notice of final cure was inadvertently filed and subsequently withdrawn."  Resp. London UMF 16.  The bankruptcy docket includes only one relevant entry, a March 10, 2016 entry noting Wells Fargo withdrew its response to the notice of final cure payment.  Bankruptcy Docket at 56.  At hearing on this motion, Wells Fargo represented that the March 10, 2016 response it provides here was filed in the claims register, not on the docket.

10

contended London still owed as "Past Due Payments" owing from August 15, 2015 through January 15, 2016, totaling six payments of either $5,391.18 or $5,896.41, with a total amount due of $32,347.08, less unapplied funds of $2,457.68. *Id.* Thus, according to Wells Fargo's second response to the notice of final cure payment, London still owed post-petition fees of $29,889.40 for payments accruing from August 2015 through January 2016, but did not owe post-petition escrow advancements made by Wells Fargo during the bankruptcy. *Id.*; *but see* UMF 15 (claiming London's deficiency arose when Wells Fargo advanced escrow on account from September 2011 through March 2014); UMF 24 (indicating Wells Fargo reviewed London's account after trustee filed notice of final cure payment and determined $29,889.40 remained outstanding because London had not paid taxes and insurance advanced by Wells Fargo from 2011 to 2014, though the internal Wells Fargo notes cited for this position, Def. Ex. 16, actually state: "BK write off forwarded for approval write off in the amount of $29,889.40 . . . . . [W]e received 31 payments of $2,450.05. The 1st notice of payment change on 2/14/12014 effective 3/15/2011 in the amount of $4,378.54."))[16] At hearing, Wells Fargo's counsel was unable to explain why Wells Fargo's second response to the notice of final cure payment had indicated no escrow was advanced on the account during the bankruptcy and attributed the purported August 2015 through January 2016 past due payments reflected in that response to Wells Fargo's accounting procedures.

On March 28, 2016, London contacted Wells Fargo, asking why Wells Fargo claimed she had missed payments. UMF 27. On April 5, 2016, Wells Fargo sent Meisner[17] an account activity statement itemizing debits and credits to London's account, along with running balances of principal, escrow, unapplied funds and fees charged. UMF 28; Activity Statement. London disputes that the statement provides an accurate itemization. Resp. UMF 28.

On April 7, 2016, Wells Fargo sent London an annual escrow disclosure statement indicating an escrow account shortage of $6,192.45. UMF 29; Def. Ex. 19. On April 8, 2016, the /////

---

[16] In these internal notes, all letters are capitalized. The court has adjusted the capitalization here.

[17] Here, London does not claim Meisner was no longer her attorney or that her then-current attorney did not receive this statement.

trustee filed a "Chapter 13 Standing Trustee's Final Report and Account," indicating Wells Fargo's claims were paid, including "Mortgage Ongoing" and "Mortgage Arrearage." Pl. RJN Ex. D at 3.

Although Wells Fargo accepted London's February 2016 through June 2016 payments, it suggests it did so only because "the bankruptcy was active." UMF 32. London disputes that the bankruptcy remained active during these months because "only clerical issues remained." Resp. UMF 32; *see* Pl. RJN Ex. D at 1 (trustee's final report and account indicating "[t]he case was completed on 02/09/2016").

On June 14, 2016, Wells Fargo sent London a letter explaining her hazard insurance would expire and she needed to purchase a new policy or Wells Fargo would purchase one for her. UMF 30; Def. Ex. 20.

F.   Bankruptcy Case Closes; Wells Fargo Rejects London's Payments and Begins Foreclosure Process; London Sues

On June 21, 2016, the bankruptcy court issued a final decree closing the bankruptcy estate. UMF 31; Def. RJN Ex. E. On June 28, 2016, one week after London's bankruptcy case closed, Wells Fargo sent London a letter stating:

> We recently applied $2,857.54 to your escrow advance balance using funds that were previously remitted and unapplied, leaving no funds unapplied. [¶] Your loan is 6 payments past due, with a total amount due of $34,615.22. . . . Your loan remains in foreclosure status, and Wells Fargo Home Mortgage is continuing to proceed with foreclosure on your home.

UMF 33; Def. Ex. 21. Nine days after London's bankruptcy case closed, on June 30, 2016, Wells Fargo sent London an account statement, which included a "Past Due Account Status" stating:

> As of the date of this statement, you are 167 days delinquent on your account. . . . The delinquent amount due on your account is $40,253.62. . . . As of the date of this statement, Wells Fargo has made the first notice or filing required by applicable law for the foreclosure process.

Pl. Ex. 9 at 43. On July 6, 2016, Wells Fargo provided London with a "reinstatement quote," which required her to pay $40,253.62 by July 29, 2016 "[t]o reinstate [her] mortgage from foreclosure." UMF 34; Def. Ex. 22; Pl. Ex. 10.

On August 1, 2016, Wells Fargo sent London a letter explaining her account "was impacted by a settlement agreement" and "due a refund of $1968.00 as a result of a late or missed payment change notice [during bankruptcy]," providing an "enclosed refund check." Def. Ex. 26 at 140; Pl. Ex. 15 at 61. London endorsed the refund check. Def. Ex. 26 at 141.

On October 31, 2016, Wells Fargo sent London an account statement indicating the loan had been referred for foreclosure with a total payment of $62,807.22 due, including unpaid escrow balance of $9,861.96. Pl. Ex. 11. On November 18, 2016, Wells Fargo's trustee filed a notice of default on London's property, indicating she was $63,002.22 in arrears. UMF 35; Def. Ex. 23; Pl. Ex. 12. That same day, Wells Fargo sent London a letter "follow[ing] up . . . about [her] request for a loan modification" and indicating it was reviewing documents London submitted in response to Wells Fargo's "request for documentation." Pl. Ex. 13.

On March 16, 2017, Wells Fargo sent London another refund of $6,654.85 arising from the settlement, this time citing "an escrow account processing delay," and again "enclos[ing] a refund check." Def. Ex. 26 at 142; Pl. Ex. 15 at 63. London endorsed the check. Def. Ex. 26 at 143. On March 30, 2017, London filed this suit and successfully moved for a temporary restraining order to prevent the April 5, 2017 foreclosure sale of her home. *See* ECF Nos. 1, 3, 14 (complaint, motion for temporary restraining order and order granting same).[18] This court later entered an order staying foreclosure. ECF No. 23.

Wells Fargo now moves for summary judgment on each of London's claims. Mot., ECF No. 60. London opposes, Opp'n, ECF No. 68-2,[19] and Wells Fargo has filed a reply, Reply, ECF No. 72. The court submitted the motion after hearing and resolves it here.

/////

---

[18] This case was originally assigned to another judge of this district, who entered the temporary restraining order, before it was randomly reassigned to the undersigned. ECF No. 15.

[19] London initially omitted her memorandum of points of authorities, but later filed an errata attaching her memorandum. *See* ECF No. 68 at 2. As Wells Fargo notes, London's 44-page memorandum well exceeds the court's 20-page limit. La Supp. Decl., ECF No. 72-1. At hearing, the court warned counsel that any future failure to comply with the court's orders may result in sanctions.

II.     LEGAL STANDARD

A court will grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "threshold inquiry" is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The moving party bears the initial burden of showing the district court "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The burden then shifts to the nonmoving party, which "must establish that there is a genuine issue of material fact . . . ." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986). In carrying their burdens, both parties must "cit[e] to particular parts of materials in the record . . .; or show [] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586 ("[the nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts"). Moreover, "the requirement is that there be no genuine issue of material fact . . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247-48 (emphasis in original).

In deciding a motion for summary judgment, the court draws all inferences and views all evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

A court may consider evidence as long as it is "admissible at trial." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). "Admissibility at trial" depends not on the evidence's form, but on its content. *Block v. City of L.A.*, 253 F.3d 410, 418-19 (9th Cir. 2001) (citing *Celotex Corp.*, 477 U.S. at 324). The party seeking admission of evidence "bears the

14

burden of proof of admissibility." *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1004 (9th Cir. 2002). If the opposing party objects to the proposed evidence, the party seeking admission must direct the district court to "authenticating documents, deposition testimony bearing on attribution, hearsay exceptions and exemptions, or other evidentiary principles under which the evidence in question could be deemed admissible . . . ." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 385-86 (9th Cir. 2010). However, courts are sometimes "much more lenient" with the affidavits and documents of the party opposing summary judgment. *Scharf v. U.S. Atty. Gen.*, 597 F.2d 1240, 1243 (9th Cir. 1979).

The Supreme Court has taken care to note that district courts should act "with caution in granting summary judgment," and have authority to "deny summary judgment in a case where there is reason to believe the better course would be to proceed to a full trial." *Anderson*, 477 U.S. at 255. A trial may be necessary "if the judge has doubt as to the wisdom of terminating the case before trial." *Gen. Signal Corp. v. MCI Telecommunications Corp.*, 66 F.3d 1500, 1507 (9th Cir. 1995) (quoting *Black v. J.I. Case Co.*, 22 F.3d 568, 572 (5th Cir. 1994)). This may be the case "even in the absence of a factual dispute." R*heumatology Diagnostics Lab., Inc v. Aetna, Inc.*, No. 12-05847, 2015 WL 3826713, at *4 (N.D. Cal. June 19, 2015) (quoting *Black*, 22 F.3d at 572); *accord Lind v. United Parcel Serv., Inc.*, 254 F.3d 1281, 1285 (11th Cir. 2001).

III.    DISCUSSION

The crux of Wells Fargo's motion is that "[London] failed to make full loan payments from September 2011 to March 2014 during her conformed plan, which required payment of escrow advances for property taxes and insurance[,]" and this failure constitutes a "clear breach of the loan." Mot. at 10. In light of London's purported breach, and citing London's purported inability to show damages, Wells Fargo argues it is entitled to summary judgment on each of her claims. *See id.* at 17−29. The court addresses each claim below and GRANTS in part and DENIES in part Wells Fargo's motion.

A.      Breach of Contract

"To prevail on a cause of action for breach of contract, the plaintiff must prove (1) the contract, (2) the plaintiff's performance of the contract or excuse for nonperformance, (3) the

15

defendant's breach, and (4) the resulting damage to the plaintiff." *Richman v. Hartley*, 224 Cal. App. 4th 1182, 1186 (2014) (citation omitted).

### 1. London's Performance

Wells Fargo contends it is entitled to summary judgment because London, rather than Wells Fargo, breached her obligations under the modification agreement. *See* Mot. at 17−18 ("The evidence is clear that Plaintiff failed to perform her obligations under the Loan by tendering interest only payments of $2,450.05 between 2011 through 2014 . . . . that did not cover the $1,045.48 'Escrow Payment' and 'Shortage Payment or Overage Credit' of $26.10 due."); *see also Consolidated World Investments, Inc., v. Lido Preferred Ltd.*, 9 Cal. App. 4th 373, 380 (1992) ("It is elementary a plaintiff suing for breach of contract must prove it has performed all conditions on its part or that it was excused from performance.") (citation omitted).

London argues she performed her obligations under the modification agreement by making agreed-to bankruptcy payments and, in any event, any nonperformance is excused because Wells Fargo prevented her full performance and determined she had made insufficient payments only several years after the fact, waiving its right to seek her performance now. *See* Opp'n at 20 (arguing Wells Fargo "conducted a *post hoc* determination on March 10, 2016 that Plaintiff failed to pay the correct amounts owed . . . ."); *id.* at 26 ("Wells Fargo waived any right to post-petition arrearages by waiting until March 10, 2016 before claiming there any [sic] post-petition arrears and then by describing the amounts owed as 'missed payments' when there were no missed payments."); *id.* at 28 ("Wells Fargo further breached the Modification Agreement by preventing Plaintiff from performing under the Modification Agreement and Confirmed Plan by sending an unclear and confusing letter entitled 'Notice of Payment Change' to the Bankruptcy Trustee on June 11, 2011.").

On this record, a reasonable jury could find London was excused from perfect performance under the contract. *See* Cal. Civ. Code § 1511 (performance excused when "prevented or delayed by the act of the creditor, . . . [or] the debtor is induced not to make it, by any act of the creditor intended or naturally tending to have that effect . . ."); *In re Flashcom, Inc.*, No. ADV 12-01339, 2014 WL 4923073, at *13 (B.A.P. 9th Cir. Oct. 1, 2014) ("California cases excusing an

improper or delayed tender of performance based on the adverse party's conduct are predicated on the adverse party having some sort of unmet duty under the parties' agreement or, in the alternative, on the adverse party affirmatively acting in some way, after the agreement was entered into, to effectively prevent timely and proper tender in accordance with parties' agreement.") (collecting cases).

Construing the record in London's favor as required here, London began making monthly bankruptcy payments of $2,450.05 to Wells Fargo in September 2011, setting off the period of allegedly insufficient payments at issue, only because Wells Fargo informed the trustee that London's new "monthly payment [was] $2,450.05," arguably without clearly indicating this amount did not include escrow fees. *See* UMF 15 (contending London's insufficient payments of $2,450.05 began in September 2011); Def. Ex. 8 (June 11, 2011 Wells Fargo letter to Meisner and trustee identifying London's new "monthly payment amount of $2,450.05" and advising reference to billing statements would be necessary only "[i]f [Wells Fargo] pays the taxes and/or insurance"); Pl. Ex. 3 (Aug. 3, 2011 letter from trustee to London reducing her plan payment from $4,139 to $3,384 as of August 2011 in light of Wells Fargo's letter "indicating your ongoing mortgage payment is decreasing from $3,130.13 to $2,450.05 effective 8/1/11") (emphasis omitted); Def. Ex. 9 (June 17, 2012 Wells Fargo letter increasing London's monthly payment amount without expressly including escrow payments but instead stating, again, "[i]f Wells Fargo pays the taxes and/or insurance, please refer to the monthly billing statement . . . ."); UMF 37 (conceding Wells Fargo did not file a PCN in August 2012 with trustee making no change to London's monthly payment); Def. Ex. 11, UMF 37 (same pattern in August 2013).

Nothing in the record before the court suggests London was able to fully perform in light of Wells Fargo's apparently incomplete or misleading representations to the trustee, as the confirmed plan required the trustee to "pay all post-petition monthly contract installments falling due on each Class 1 claim." Conf. Plan at § 3.09; *see* 11 U.S.C. § 1326(c) ("Except as otherwise provided in the plan or in the order confirming the plan, the trustee shall make payments to creditors under the plan."). With evidence showing Wells Fargo instructed the trustee to have London pay $2,450.05 without clearly indicating London owed additional amounts, and a record indicating

Wells Fargo made no effort to correct that amount for three years, a reasonable jury could find Wells Fargo limited London to paying that amount. *See, e.g.*, *Uhler v. Ocwen Fed. Bank*, No. 1:08-CV-457-HJW, 2011 WL 2489765, at *3 (S.D. Ohio June 21, 2011) (denying summary judgment where "record reflects genuine disputes as to whether [servicer] met its servicing obligations, including the various notification requirements"; collecting bankruptcy decisions finding servicer waived right to recover arrearages for escrow advances where it failed to timely notify borrower of deficiency) (citing *In re Johnson*, 384 B.R. 763 (Bankr. E.D. Mich. 2008), *Chase Manhattan Mortgage Corp. v. Padgett*, 268 B.R. 309 (S.D. Fla. 2001), *In re Craig–Likely*, 2007 WL 5185289 at *4 (E.D. Mich. 2007)); *see id.* at n.7 (noting cited bankruptcy decisions "were based on legal waiver, not bankruptcy discharge").

In contrast, there is evidence indicating that when Wells Fargo provided proper notice, plaintiff fully performed under the agreement. When Wells Fargo sent notices specifically identifying the post-petition amount due, expressly including escrow amounts, the trustee adjusted London's bankruptcy payments to cover escrow fees. *See* Def. Ex. 12 (Dec. 27, 2013 letter to Meisner identifying new "post petition payment amount" of $4,378.54 effective March 15, 2014); UMF 36 (undisputed Wells Fargo filed PCN on February 14, 2014); Def. Ex. 18 at 98 (indicating Wells Fargo received $4,378.54 payment from London and $594.55 payment from trustee in April 2014); UMF 15 (claiming London's allegedly deficient payments continued only through March 2014).

To the extent Wells Fargo argues the escrow deficiency should have been obvious to London, her counsel or the trustee, that argument cannot prevail at summary judgment. The record on Wells Fargo's notice to London, her bankruptcy attorney and the trustee is less clear than Wells Fargo suggests. For example, Wells Fargo's first post-bankruptcy communication with Meisner stated London owed $3,130.13 on January 15, 2011 and indicated "[t]his amount may have been reduced due to the removal of an existing escrow shortage payment," rather than suggesting additional escrow shortage amounts may be due. Def. Ex. 7. This communication also advised, "[f]or the duration of the bankruptcy, billing statements will not be mailed," *id.*, though Wells Fargo now argues it in fact mailed monthly billing statements that "clearly advised" London of increases

18

and decreases to her monthly amount owed post-confirmation, *see* Reply at 7. Those monthly statements, however, do not resolve the confusion. London disputes receiving them, while saying she does not remember much after the bankruptcy case was filed. London Dep. at 37:25−38:1, 51:21−24. Further, while each monthly billing statement provided in section "2. Current payment explanation" an "Escrow/other" amount, along with large past due amounts and late charges and fees, each statement also included a bankruptcy disclaimer stating, "this statement is for information purposes only. It reflects Post Petition amounts under Section 2 (except for Total Outstanding Deferred Interest) and may not include all fees incurred." *See, e.g.*, Def. Ex. 24 at 6 (July 22, 2013 statement indicating $1,045.48 in "Escrow/other," $44,452.08 past due and $1,274.42 in late charges and fees).

Wells Fargo also argues it could not have waived its entitlement to the escrow amounts because London "never filed a motion for determination" under Federal Rule of Bankruptcy Procedure 3002.1(h)[20] in response to Wells Fargo's second final cure response filed under Rule 3002.1(g),[21] and thus "it is [London] who waived her right to have the bankruptcy court determine she in fact made all required post-petition payments." Reply at 10. Wells Fargo cites no authority supporting this argument, which is hardly obvious. *See, e.g.*, *In re Howard*, No. 10-52527 SLJ, 2016 WL 8222335 (Bankr. N.D. Cal. Aug. 14, 2016) (after ordering debtor to file

---

[20] "On motion of the debtor or trustee filed within 21 days after service of the statement under subdivision (g) of this rule, the court shall, after notice and hearing, determine whether the debtor has cured the default and paid all required postpetition amounts." Fed. R. Bankr. P. 3002.1(h).

[21] Under this provision:

> Within 21 days after service of the notice under subdivision (f) of this rule, the holder shall file and serve on the debtor, debtor's counsel, and the trustee a statement indicating (1) whether it agrees that the debtor has paid in full the amount required to cure the default on the claim, and (2) whether the debtor is otherwise current on all payments consistent with § 1322(b)(5) of the Code. The statement shall itemize the required cure or postpetition amounts, if any, that the holder contends remain unpaid as of the date of the statement. The statement shall be filed as a supplement to the holder's proof of claim and is not subject to Rule 3001(f).

Fed. R. Bankr. P. 3002.1(g).

motion under Rule 3002.1(h), finding mortgage holder's response under Rule 3002.1(g) not entitled to prima facie presumption owed to claim, response must identify with particularity all postpetition amounts owed, and mortgage holder bears burden of establishing prepetition cure amounts still outstanding). Moreover, even if London was required to contest Wells Fargo's second Final Cure Response, that Response expressly disclaimed escrow advanced on the account during bankruptcy and attributed the past due amounts to the period August 15, 2015 through January 15, 2016. Def. Ex. 17. It is unclear, then, how this Notice put London or the bankruptcy court on notice of the post-petition escrow payments from September 2011 through March 2014 that Wells Fargo now contends are missing and justify foreclosure.

Finally, as an independent reason for denying summary judgment, the court notes the record before the court is simply less clear than Wells Fargo contends it is. Wells Fargo repeatedly argues London "made only partial payments by tendering the $2,450.05 from 2011 through 2014." Reply at 13. At the same time, Wells Fargo admits it "also received additional payments of other amounts during this time," and its records, which are not explained, suggest some of those other payments were significant. *See* Smith Decl. ¶ 16 n.1; *see also, e.g.*, Activity Statement at 92 (indicating Wells Fargo received "Trustee Funds" in the amount of $1,189.10 on January 11, 2012 and "Debtor Funds" in the amount of $2,450.05 on January 12, 2012). Wells Fargo makes no attempt to explain how much it actually received from London, whether these additional amounts were paid toward London's alleged escrow arrears, or how the court can treat as undisputed London's purported "repeated payments of [only] $2,405.05" in light of these additional payments.

Ultimately, London's breach of contract claim may turn on whether Wells Fargo is correct that "any failure by [London] or the trustee to account for payment changes does not equate to any breach by Wells Fargo." *See* Reply at 7. On this record, however, the court cannot resolve that question, which must be presented to the factfinder.

2.    Damages

Wells Fargo also argues there is no triable issue as to whether London suffered damages from Wells Fargo's alleged breach. Mot. at 19 (arguing "case authority is clear that

because Plaintiff did not satisfy all of her post-petition payments, there are no damages arising from payments she was required to make") (citations omitted). Whether London satisfied her obligations is disputed, and London states she experienced severe emotional distress throughout this process, during which she came within one day of losing her home to foreclosure. London Decl. ¶¶ 33−39. At this juncture, London's declaration suffices to withstand summary judgment of damages as well.

As to this claim, the motion is DENIED.

B.     Promissory Estoppel

Among several other arguments, Wells Fargo contends London cannot pursue a promissory estoppel claim where a valid contract exists, as the valid contract limits London to a breach of contract claim. Mot. at 20−21. London's promissory estoppel claim arises from the modification agreement, as does her breach of contract claim. First Am. Compl. ("FAC"), ECF No. 37, ¶¶ 51−56. London defends her claim, but does not address this threshold argument. Opp'n at 35−36. Wells Fargo is correct. *See Realtek Semiconductor Corp. v. LSI Corp.*, No. C-12-03451-RMW, 2013 WL 4778140, at *2 (N.D. Cal. Sept. 6, 2013) (granting motion for summary judgment on promissory estoppel claim where undisputed there was a valid contract supported by consideration concerning same promise).

As to this claim, the motion is GRANTED.

C.     California Civil Code section 2924.17

Under section 2924.17 of the California Homeowner Bill of Rights ("HBOR"), as relevant here, a servicer may not file a notice of default without first "ensur[ing] that it has reviewed competent and reliable evidence to substantiate the borrower's default and the right to foreclose, including the borrower's loan status and loan information." Cal. Civ. Code § 2924.17(a)−(b).

Wells Fargo argues it is entitled to summary judgment on this claim because London "made partial payments of amounts owed under the Loan by failing to cover escrow advances from 2011 through 2014" and Wells Fargo's notice of default therefore was substantiated before the notice was recorded. Mot. at 22−23. This argument turns on the disputed facts identified above. Accordingly, in this respect, the motion is DENIED.

/////

21

Wells Fargo also argues London impermissibly seeks $50,000 in damages under section 2924.12(a)(1).  Mot. at 23.  Wells Fargo is correct that HBOR limits actual damages to cases in which a trustee's deed upon sale has been recorded.  Cal. Civ. Code § 2924.12(b).  At hearing, London's counsel conceded that because no trustee's deed upon sale has been recorded here, London is limited to "injunctive relief to enjoin a material violation of Section . . . 2924.17." *See* Cal. Civ. Code § 2924.12(a)(1).  In this respect, the motion is GRANTED.

D.       Rosenthal Fair Debt Collection Practices Act

Wells Fargo contends it cannot be found to have "use[d] unfair or unconscionable means to collect or attempt to collect any debt" in violation of the Rosenthal Fair Debt Collection Practices Act because "Plaintiff did not fully perform" and Wells Fargo was "merely [] trying to collect the amount of debt agreed to."  Mot. at 23−24.  For reasons discussed above in the breach of contract analysis, Wells Fargo's argument relies on disputed facts.  Accordingly, the motion as to this claim is DENIED.

E.       Equal Credit Opportunity Act

Wells Fargo argues it "did not engage in an 'Adverse Action'" under the Equal Credit Opportunity Act because "Plaintiff breached the loan," London was "plainly advised . . . her Loan was not current as of March 2016," and Wells Fargo was not required to "extend additional credit under an existing credit arrangement" in light of London's delinquency.  Mot. at 24−25.  These arguments also would require the court to resolve disputed facts in Wells Fargo's favor, which it cannot do on summary judgment.  The motion with respect to this claim is DENIED.

F.       California Business & Professions Code section 17200

Finally, Wells Fargo argues London lacks standing to pursue an unfair competition law ("UCL") claim because she "did not suffer an economic injury, or loss of money or property, as a result of Wells Fargo's alleged breach of the parties' loan agreement," and because she has not established Wells Fargo maintained an unlawful, unfair or fraudulent business practice.  Mot. at 27−28.  These arguments also rely on disputed facts.  The motion as to this claim is DENIED.

/////

/////

22

IV.    <u>CONCLUSION</u>

Wells Fargo's motion for summary judgment is GRANTED as to the promissory estoppel claim and London's claim for money damages under the HBOR.  In all other respects, the motion is DENIED.

The court SETS a final pretrial conference for **November 1, 2019 at 10 a.m.**  The parties shall file their joint final pretrial status report at least seven (7) days before November 1.

IT IS SO ORDERED.

DATED:  September 19, 2019.

_____
UNITED STATES DISTRICT JUDGE